JOURNAL ENTRY AND OPINION
This is an appeal from a jury verdict, following trial before Judge Bert W. Griffin, convicting appellant Phil Thomas[1] on two counts of felonious assault, each with a firearm specification, and for possessing a weapon under a disability. He claims that the State failed to establish a valid waiver of his Miranda rights and that his oral statement to the police was improperly admitted into evidence; that a witness was impermissibly allowed to comment that he had refused to submit a written statement to police, in violation of his right to remain silent; and that his convictions were against the manifest weight of the evidence. We affirm.
From the record we glean the following: At about 8:00 a.m. on October 22, 1999, Thomas, a passenger in a black and gray conversion van driven by his girlfriend, Lisa Ellis, left their home on Hamm Avenue to pick up some of his children from the home of his former girlfriend, Bennie Hellums, on E. 76th Street, and take them to school for a field trip.[2]
According to Ms. Ellis, Rodrick Boyd (aka Roger Boyd), and a red car with two passengers, were obstructing traffic on E. 76th Street and Aetna Avenue and, to urge free passage, Thomas leaned over and sounded the horn. A verbal exchange then resulted between Boyd and Thomas; eventually, the van arrived at the Hellums home, Thomas got out and Ellis left.
According to Boyd and his brother, Jesse Laster, as they were walking on E. 76th Street to South High School a gray and black van almost hit them and they had an argument with its male passenger, later identified as Thomas. Because Laster attends John F. Kennedy High School, upon arriving at South High, the brothers waited at a bus stop for Laster's bus, and then saw a friend who agreed to drive Laster there. Boyd claimed that on the way to JFK, he noticed Thomas driving on E. 76th Street in a blue Ford Taurus station wagon with a different woman and some children. He and Thomas again exchanged heated words; this time, Thomas actually exited his vehicle, and the woman had to convince him to get back in the car.
Hellums testified that she, Thomas, and two of their daughters left her home on E. 76th at around 8:30 a.m., to go to Paul Revere Elementary School, where Thomas was to accompany one of the girls on a field trip. She claimed she noticed Boyd exit a red car along with its driver and another passenger and engage in what she perceived as a drug transaction in front of her house and that Thomas told the youths to take that up the street. She testified that, when she, the children and Thomas attempted to drive down E. 76th Street, the boys and the red car were again obstructing traffic, prompting the second argument between Boyd and Thomas.
Thomas and his daughter went on her field trip. Upon returning to the school at around 2:00 p.m., his daughter's teacher advised him another teacher wished to speak with him. Alicia Copeland, the other daughter's teacher, testified that she did speak with Thomas, and that he left the school at approximately 2:30 p.m.
Ellis stated she picked up Thomas and his daughters at the school about 2:30 p.m., that the van stalled on the way home and that Thomas persuaded an unidentified man in a truck to push it home. She claimed that after arriving home, a friend came over to visit and that Thomas was at home for the remainder of the day.
Boyd and Laster claimed, however, that around 2:50 p.m., when they and another friend, who also had a red car, were outside their home talking, the same black and gray van they had seen earlier that day drove up, and its driver and Boyd had another argument. Prepared to fight the driver, Boyd approached and the driver pointed a shotgun out of his window and fired four times. Boyd, in front of the red car, was struck in the right leg and side, and in the face, with birdshot, Laster fled, and the friend in the red car ducked down in his seat to avoid the shots that peppered the back and driver's side of his car and blew out its back window. The friend drove Boyd to St. Luke's hospital, sideswiping a guard rail or fire hydrant along the way, further damaging the car, and Boyd was then life-flighted to Metro Hospital for emergency surgery. In the course of police investigation, both Boyd and Laster identified Thomas as the man Boyd had argued with earlier in the day, and Boyd identified him as the shooter.
Ricardo Robinson, a casual acquaintance of the boys who was walking to work at a factory on E. 76th Street, stopped to say hello shortly before the van appeared that afternoon. He was also injured by the shots fired from the gray and black van. He was able to get to work, and he was taken by ambulance to Mt. Sinai Hospital where he was treated and released. He could not identify the shooter in the van.
A Cleveland police car was dispatched to the scene, and the officers secured and photographed the street and recovered four spent shotgun shells. They also photographed the friend's badly damaged red car when he returned to the scene from St. Luke's Hospital.
Detective Karen O'Neal investigated the shooting and stated that the police had received an anonymous tip indicating that the gray and black van used in the shooting could be found at Ms. Ellis' Hamm Avenue address. Upon arriving there she found Thomas, questioned him and, based on his oral statement, arrested him. She also spoke to Ms. Ellis, who told her that Thomas could not be the shooter because he was with her during the times in question but, when Detective O'Neal later tried to obtain a written statement about this possible alibi, Ms. Ellis was never home any time she attempted a follow-up visit, and made no attempt to contact the Detective at any time. Detective O'Neal also interviewed Ms. Hellums who confirmed the morning arguments between Boyd and Thomas and, based upon information from her daughters, testified that Thomas had stayed with the girls all that Friday afternoon, and returned them to her home the next day.
Detective O'Neal stated that Boyd positively identified Thomas as the shooter in a photo array shortly after the shooting, but that Laster did not. According to Detective O'Neal, after she had given Thomas his Miranda warnings at the Hamm Avenue residence, he told her that, during the morning arguments, Boyd had threatened to kill his children and asked her What would you do?, or words to that effect. He declined to provide a written statement during further questioning at the police station.
Thomas was indicted for the attempted murder of Boyd, with a firearm specification; the felonious assault of Boyd and Robinson, with a firearm specification; and for possessing a firearm under a disability.[3] The jury convicted him on all counts except the attempted murder charge, and he now appeals. Thomas' first assignment of error states:
 I. The Defendant's Oral Statement Was Admitted in Evidence Without Proof by a Preponderance of The Evidence That He Waived His Miranda Rights.
An interrogating police officer must advise a suspect of his constitutional right to remain silent and decline to answer questions or give a statement.[4] Thomas contends that the Miranda warnings he was given before he allegedly gave Detective O'Neal an oral statement were insufficient, rendering her testimony about what he told her at Hamm Avenue inadmissible.
At trial, however, no objection was made to the admission of his oral statement, through the testimony of Detective O'Neal, nor was the exact nature of the verbal warnings she administered at the police station questioned. On appeal a defendant waives all but plain error in the admission of evidence at trial if he does not object at the time the evidence is introduced.[5] Error is not plain error unless the outcome of an accused's trial clearly would have been otherwise, but for the error.[6] The standard for plain error is whether substantial rights of the accused are so adversely affected as to undermine the fairness of the guilt determining process.[7] Notice of plain error is to be taken with the utmost of caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice.[8]
Detective O'Neal testified in general terms that she advised Thomas of his Miranda rights and that he understood them before she questioned him at Hamm Avenue. We have no reason to doubt the veracity of her testimony nor, apparently, did Thomas. Accordingly, we see no plain error and this assignment of error is not well taken.
II. The Trial Court Erred to The Prejudice of Appellant, And in Violation of Rights Conferred by Article I, Section 10 of The Ohio Constitution And The Fifth And Fourteenth Amendments to The Constitution of The United States When Over The Objection of Appellant, The Prosecution Elicited Testimony Concerning Appellant's Failure to Make a Statement.
At trial, the following exchange between the Assistant Prosecutor and Detective O'Neal took place after they discussed the contents of Thomas's oral statements:
 Q: And after you had this discussion with the defendant, what did you do next, as far as your investigation?
 A: Placed him under arrest. Well, he knew he was under arrest. I told him.
I thought he may want to give me a statement. We went to the Third District as opposed to they book people at the Justice Center, but I took him to my office and asked him if he wanted to have a lawyer, that was fine; if he wanted to give me a statement, that was fine, too; a written statement at that time, and, at that time, he chose not to give me a statement —.
Thomas objected, and moved for a mistrial, on the grounds that eliciting a statement from a witness as to his failure to give a written statement at trial was an impermissible denial of his right to be free from prejudice from exercising his right to remain silent. Rather than declare a mistrial, the judge decided to immediately advise the jury that they could not hold against [Thomas] his refusal to issue a written statement. In addition, as part of the charge to the jury, the judge reiterated that the failure to give a statement to police could not be evaluated by the jury to Thomas's prejudice.
In Doyle v. Ohio,[9] the United States Supreme Court reversed the convictions of two defendants, where each had testified about an alibi at trial, but, when arrested, had not given statements consistent with their trial testimony to police. The prosecution cross examined the defendants as to why each did not immediately protest his innocence to police, assuming their alibis were legitimate and not fabricated after the fact. The Court stated, "When a person under arrest is informed, as Miranda requires, that he may remain silent, that anything he says may be used against him, and that he may have an attorney if he wishes, it seems * * * that it does not comport with due process to permit the prosecution during the trial to call attention to his silence at the time of arrest and to insist that because he did not speak about the facts of the case at that time, as he was told he need not do, an unfavorable inference might be drawn as to the truth of his trial testimony. . . . Surely Hale was not informed here that his silence, as well as his words, could be used against him at trial. Indeed, anyone would reasonably conclude from Miranda warnings that this would not be the case."[10]
In Greer v. Miller,[11] by contrast, the United States Supreme Court held that, even assuming a Doyle violation in the State's pursuit of its case, if the damaging references to a defendant's silence are isolated comments subject to curative instruction, such that it is clear that the statements would not impinge upon the fundamental fairness of the trial, reversal is not warranted. The Court stated:
 When a defendant contends that a prosecutor's question rendered his trial fundamentally unfair, it is important `as an initial matter to place th[e] remar[k] in context.' * * * The sequence of events in this case — a single question, an immediate objection, and two curative instructions — clearly indicates that the prosecutor's improper question did not violate [the defendant's] due process rights.[12]
In Ohio, appellate courts have declined to overturn convictions based upon a limited inquiry of a defendant's post-Miranda warning silence, where it does not constitute a continuous and invading inquiry regarding defendant-appellant's post-Miranda silence.[13]
Finally, even where courts have assumed error from the introduction of a statement regarding a defendant's exercise of the right to remain silent, the admission of such a statement will constitute harmless error beyond a reasonable doubt if, because of the relative strength of other evidence introduced, * * * the testimony about the silence could have influenced the jury and contributed to the conviction so that `absent the cross-examination * * *, no juror could have entertained a reasonable doubt' as to * * * [the defendant's] guilt.'"[14]
Here, the State arguably did not even induce Detective O'Neal's statement that Thomas declined to issue a written statement — she merely volunteered it and the prosecutor did not pursue any questioning about it. After objection, the judge immediately admonished the jury that it could not hold Thomas's silence against him, and repeated it in his charge. Had the jury never heard the impermissible reference to Thomas's refusal to submit a written statement and believed the testimony of Boyd and Detective O'Neal, it would still have been justified in finding Thomas guilty of both counts of felonious assault and possession of a weapon under a disability. The introduction of the statement would constitute harmless error and this assignment of error is not well taken.
III. The Conviction Was Against the Manifest Weight of the Evidence.
In evaluating a challenge to the verdict based on the manifest weight of the evidence presented at trial, a court sits as the thirteenth juror, and intrudes its judgment into proceedings which it finds to be fatally flawed through misinterpretation or misapplication of the evidence by a jury which has lost its way.[15] This power is subject to strict and narrow constraints: Weight of the evidence concerns `the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief. * * *'
`The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'[16] Thomas contends that the jury was completely unjustified in lending any credibility to Boyd's testimony because of the allegations that Boyd was a drug dealer, and due to small factual inconsistencies in his testimony about his arguments with Thomas. Similarly, he argues that Laster's testimony was completely unbelievable because he is Boyd's brother, and would corroborate anything Boyd said. He suggests that Laster's in-court identification of him as the man in the gray and black van, with whom Boyd had argued on the morning of October 22, 1999, was a fabrication because, shortly after the incident, he was unable to identify Thomas as the shooter from Detective O'Neal's photo array. Additionally, Thomas submits that the evidence proved it was logistically impossible for him to have returned with Ms. Ellis and the children to the Hamm Avenue residence, and then proceed in her van to E. 76th Street and accost anyone in the time frame suggested by the State.
The parties acknowledged that Boyd and Thomas were unknown to each other before October 22, 1999, and, even if one were to completely ignore Laster's in-court identification of Thomas, Boyd identified him as the shooter on the basis of Detective O'Neal's photo array days after the incident. He testified that he was only a few feet from Thomas's van when the first shot was fired, and had a clear view of his face at that time. Detective O'Neal testified that, depending on the traffic, it would take someone approximately twenty-five minutes to go from Paul Revere Elementary School to Hamm Avenue, drop off Ms. Ellis and the children, and then drive to 76th Street. The jury, therefore, had evidence Thomas could have left the school and arrived at E. 76th Street by 2:50 p.m. to commit the crimes alleged.
Given the testimony in this case, any witness could have been viewed as truthful or untruthful if one were to believe the assertions of bad character or bias advanced by both parties about the opposing witnesses. Even if we accept Thomas's theory of defense, we decline to interject our judgment over that of the jury. The evidence presented does not weigh heavily against conviction, we cannot find the verdicts rendered in this case to be manifest miscarriages of justice, and this assignment of error is not well taken.
Judgment affirmed.
It is ordered that appellee recover of appellant costs herein taxed.
This court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Cuyahoga County Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
JAMES D. SWEENEY, P.J., CONCURS IN JUDGMENT ONLY WITH SEPARATE OPINION; TERRENCE O'DONNELL, J., CONCURS AND CONCURS WITH JUDGE SWEENEY'S SEPARATE CONCURRING OPINION. ANNE L. KILBANE, JUDGE.
[1] aka Phil Johnson, Tashawn Webb and Michael Williams.
[2] It was established at trial that Thomas and Hellums had been together for eight years before parting ways, and had five children. Thomas and Ellis, at the time of trial, lived together, and had an infant daughter of their own.
[3] At trial, the parties stipulated to the fact that Thomas had a disability, but not to his possession of a firearm.
[4] Miranda vs. Arizona (1966), 384 U.S. 436, 86 S.Ct. 1602,16 L.Ed.2d 694.
[5] State v. Jones (2001), 91 Ohio St.3d 335, 343, 744 N.E.2d 1163,1175.
[6] State v. Nicholas (1993), 66 Ohio St.3d 431, 436, 613 N.E.2d 225,229.
[7] State v. Swanson (1984), 16 Ohio App.3d 375, 377.
[8] State v. Pumpelly (1991), 77 Ohio App.3d 470, 475, 602 N.E.2d 714,717.
[9] Doyle v. Ohio (1976), 426 U.S. 610, 96 S.Ct. 2240,49 L.Ed.2d 91.
[10] Doyle, supra, 426 U.S. at 618, 96 S.Ct. at 2245,49 L.Ed.2d at 98.
[11] Greer v. Miller (1987), 483 U.S. 756, 107 S.Ct. 3102,97 L.Ed.2d 618.
[12] Greer, supra, 483 U.S. at 766, 107 S.Ct. at 3109,97 L.Ed.2d at 631 (internal cites omitted).
[13] See State v. Dixon (Mar. 13, 1997), Cuyahoga App. No. 68338, unreported, State v. Brown (May 1, 1991), Lorain App. Nos. 90CA004836 and 90CA004838, unreported.
[14] State v. Motley (1985), 21 Ohio App.3d 240, citing Hayton v. Egeler (C.A. 6th, 1977), 555 F.2d 599, 603.
[15] See State v. Thompkins, (1997), 78 Ohio St.3d 380,678 L.E.2d 541.
[16] State v. Tompkins, supra at 387, 678 N.E.2d 541, * * * (internal cites omitted).